IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jerry Jackson, #81094-071, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 6:06-2812-GRA-WMC |
| | ) |
| John J. LaManna, Warden of FCI | ) |
| Edgefield; NFN Acosta, Associate | ) **REPORT OF MAGISTRATE JUDGE** |
| Warden; Steve Harrison; Associate | ) |
| Warden; Wanda Harrison, Case | ) |
| Manager Coordinator; F. Spoon, | ) |
| Factory Manager; K. Joy, Unit | ) |
| Manager; E.S. Eubanks, Case | ) |
| Manager; K. Hammond, Case | ) |
| Manager; H. Taylor, Case Manager; | ) |
| H. Wall, Case Manager; L. F. Rosaria, | ) |
| HAS; W. Serting, DDS; NFN Nicholas, | ) |
| Captain; S. Markides, Chief Dentist; | ) |
| and G. Bryan Pownell, Executive | ) |
| Assistant, | ) |
| | ) |
| Defendants. | ) |
| | ) |

The plaintiff, a federal prisoner proceeding *pro se*, seeks relief pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A) and Local Civil Rule 73.02(B)(2)(e) D.S.C., all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate Judge for consideration.

The defendants filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 on February 1, 2007. By order filed February 2, 2007, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the

summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion.  On February 26, 2007, the plaintiff filed a response to the motion.

## FACTS PRESENTED

The plaintiff was sentenced on December 11, 2001, to a 151-month term of imprisonment by the United States District Court for the District of South Carolina, for the offense of bank robbery (18 U.S.C. § 2113(a)).  He is currently incarcerated at the Federal Correctional Institution ("FCI") Edgefield, South Carolina, and has a projected release date of June 6, 2012, via Good Conduct Time ("GCT") release.  The defendants in this action are:  John J. LaManna, Warden, FCI Edgefield; Oscar Acosta, Associate Warden, FCI Edgefield, Steve Harrison, Associate Warden, FCI Edgefield; Wanda Harrison, Case Manager Coordinator, FCI Edgefield; Frank Spoon, Factory Manager, FCI Edgefield; Kevin Joy, Unit Manager, FCI Edgefield; Elizabeth Eubanks, Case Manager, FCI Edgefield; Kelly Hammond[1], Case Manager, FCI Edgefield; Henry Taylor, Case Manager, FCI Edgefield; Henry Wall, Case Manager, FCI Edgefield; Luisa Rosario, Health Services Administrator, FCI Edgefield; Wilnetta Sweeting, Chief Dental Officer, FCI Edgefield; Nicholas, Captain; S. Makrides, Chief Dentist, Central Office; and G. Bryan Pownall, Executive Assistant, Central Office.

The plaintiff alleges three causes of action.  First, he alleges he has erroneously been classified as a management variable custody inmate, which hinders him from participating in programs at a lower level facility.  He also asserts he has requested a transfer to another BOP facility but has been told the facilities he requests to be sent to have limited bed space; however, other inmates similarly situated have been transferred

---

[1]Ms. Hammond passed away on January 5, 2007.

to these facilities.  Since the plaintiff's arrival at FCI Edgefield he has requested to be transferred to an institution nearer his release residence in Asheville, North Carolina.  Def. m.s.j., ex. 4-9.  The BOP attempts to designate inmates to facilities as close to their homes as possible, ordinarily within 500 miles, commensurate with their security needs.  *Id.*

The BOP policy on designations also dictates that once an inmate is within a 500-mile radius of his release residence, he is not eligible for a "nearer to release" transfer.  Def. m.s.j., ex. 10.  The plaintiff is currently within 500 miles of his release residence; however, when a request for transfer is made each case is individually reviewed and is influenced by a variety of factors such as the inmate's disciplinary history, institutional adjustment, population pressures, and other management concerns.  Def. m.s.j. ex. 4-9.  Even though the plaintiff is within the 500-mile radius established by BOP policy, his Unit Team has submitted him for a transfer on three occasions.  *Id.*  According to the defendants' evidence, two of the requests were denied due to lack of bed space and one request was denied because of the plaintiff's medical care level.  *Id.*; see also def. m.s.j., ex. 11.  In addition, because the plaintiff is scored as a "Low" security level inmate and is incarcerated at a "Medium" security institution, he has had a management variable of "population management" applied to his case.  *See* def. m.s.j. ex. 4-9, 11.  A management variable is required when placement has been made and/or maintained at an institution level inconsistent with the inmate's scored security level.  *See* def. m.s.j., ex. 10, ch. 5, p. 1.  Specifically, the "population management" management variable is used when a situation occurs in which an inmate requires housing in a facility which is not commensurate with his or her security level.  *Id.* at ch. 5, p. 3.  According to the defendants, this situation has arisen in the plaintiff's case; thus, the "population management" management variable is appropriately applied.  *See* def. m.s.j., exs. 4-9.  When the situation arises that the management variable is no longer applicable to the plaintiff, it will be removed accordingly. *Id.*

3

Next, the plaintiff alleges he was discharged from employment and illegally demoted from his work assignment in the Federal Prison Industry (a.k.a. UNICOR) because of his race. Specifically, the plaintiff states he received a medical incident report in which he was subsequently found to not have committed a prohibited act. However, three white inmates who also received incident reports and were sent to administrative detention for approximately two months were reinstated to their UNICOR jobs within one week. The plaintiff also alleges UNICOR hired a white inmate after his removal just so they would not have to reinstate him.

On September 19, 2005, the plaintiff was accepted for a work assignment within the UNICOR factory where he remained until April 18, 2006, at which time he was placed in administrative detention for a possible violation of BOP rules. *See* def. m.s.j., ex. 12, 13. While the plaintiff was housed in administrative detention, his position in UNICOR was filled by another inmate due to customer demands being experienced by the factory at that period in time. *Id.* The plaintiff was released from administrative detention on May 14, 2006; however, the factory had experienced a hiring freeze in the department where he was assigned, both prior to and after the plaintiff's placement in administrative detention. *Id.* He was informed that as soon as the hiring freeze was lifted, he would be reinstated into his UNICOR work assignment. *Id.* The plaintiff was reinstated into his UNICOR work assignment once the hiring freeze was lifted on July 17, 2006. *Id.* According to the defendants, the other inmates the plaintiff claims were placed in administrative detention at about the same time he was but were reinstated to their UNICOR work assignments within one week of their releases worked in a department where a hiring freeze was not in effect. *Id.*

Lastly, the plaintiff alleges he has been denied adequate dental care. Specifically, he claims he has been waiting for dental care for over three years and has requested dentures for four years because he has trouble eating hard foods and his gums

4

are sore. He alleges he has signed up for dental sick call on several occasions to no avail and continues to have swelling and irritation of his gums.

On April 7, 2004, the plaintiff was seen by the Dental Department for a comprehensive cleaning and examination. *See* def. m.s.j., ex. 14, 15 at p. 000003. On November 23, 2004, he indicated he wanted dentures and it was explained to the plaintiff that routine dental care such as hygiene appointments, endodontic, restorative treatments, and fabrication of a prosthesis are considered non-emergency, and routine care such as restorative treatment would need to be completed prior to any consideration for partials. *Id.* The plaintiff did not seek dental treatment again until March 21, 2005, at which time he once again requested to be provided with partials. Def. m.s.j., ex. 15 at p. 000005. An oral examination was conducted with no swelling or irritation of the gums noted. The plaintiff was informed he was on the dental waiting list to have eight cavities restored which would need to be completed before he would be placed on the waiting list to receive partials. Def. m.s.j., ex. 14, 15 at p. 000005.

According to the defendants, the purpose and scope of the BOP's dental services is to stabilize and maintain the inmate population's oral health. Dental care is to be conservative, providing necessary treatment for the greatest number of inmates within available resources. *See* def. m.s.j., ex. 16. The FCI Edgefield Dental Services Department provides non-emergency dental care for sentenced inmates, as resources of staff, time, and materials are available, and commensurate with the inmate's ability to maintain good oral health. Def. m.s.j., ex. 14 . Non-emergency dental treatment is elective, which includes, but is not limited to: radiographs, oral health instructions, indicated prophylaxis, other periodontal therapy, endodontic and restorative treatments, oral surgery, and the fabrication of prosthesis. Def. m.s.j., ex. 16 at p. 12, 13. Thus, the defendants contend that under the BOP guidelines, the plaintiff's claim for the need of a partial falls within the non-emergency dental care category because, although he is missing

5

approximately 16 teeth, he has not exhibited any signs of inadequate mastication (problems with grinding or crushing food in preparation for swallowing). Def. m.s.j., ex. 14. The BOP dental policy sets forth that removable partial dentures may be provided at the Chief Dental Officer's discretion. Def. m.s.j., ex. 16 at p. 13. The BOP is not required to replace missing teeth, regardless of when or where the teeth were removed. *Id.* In addition, a removable partial denture will not be taken if any of the following conditions are present: poor periodontal health, poor oral hygiene, non-restorable teeth present, chronic infection, restorations have not been completed, eight or more posterior teeth in occlusion (to include bicuspid occlusion), or the inmate has less than one year remaining on his or her sentence. All removable partial dentures will be initiated only after periodontal, surgical, and restorative treatment is completed. *Id.* at p. 14.

As relief, the plaintiff asks the court to enter a declaratory judgment stating he has been deprived of his property without due process, he has been retaliated against for exercising his right to petition the government for redress of grievances, he has been discriminated against based upon his race, and he has been subjected to arbitrary and capricious treatment. He requests a permanent injunction be issued directing the defendants to hold a fair and impartial hearing on the reasons why he was discharged and demoted from his UNICOR assignment, direct the defendants to reinstate him into his UNICOR assignment, direct the defendants to issue him partials, and direct the defendants to transfer him. He requests to be awarded all back pay and benefits of which he was entitled for the time he was unlawfully denied employment with UNICOR. Lastly, the plaintiff asks the court to award him compensatory and punitive damages.

## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue.  *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion.  *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

7

entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248. Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must provide existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

The defendants first argue that this court lacks subject matter jurisdiction over the plaintiff's claims against them in their official capacities. This court agrees. Section 1983 allows a civil action to recover damages for deprivation of a constitutionally protected right. *Bivens,* 403 U.S. at 395-96. However, a suit against a federal agency or federal officer in his or her official capacity is actually a claim against the United States. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989). Such a suit lies only where the United States has waived sovereign immunity. *F.D.I.C. v. Meyer,* 510 U.S. 471, 475 (1994). The United States has not waived its sovereign immunity for constitutional misconduct. *See id.* at 477-78. Accordingly, the doctrine of sovereign immunity shields the United States from suit absent its consent to be sued. Therefore, this court lacks jurisdiction over the plaintiff's claims against the individual defendants in their official capacities, and those claims should be dismissed.

It is well settled that liability in civil rights cases brought under *Bivens* or 42 U.S.C. § 1983 may not be premised upon a respondeat superior theory. *See Polk County v. Dodson,* 454 U.S. 312, 325-26 (1981) and *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694 (1978). The plaintiff must establish three elements to hold a supervisor liable for a constitutional injury inflicted by a subordinate: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to people like the plaintiff; (2) the supervisor's response was so inadequate as to constitute deliberate indifference or tacit authorization of the subordinate's conduct; and (3) there is an "affirmative causal link" between the supervisor's inaction and the plaintiff's constitutional injury. *Shaw v. Stroud,*

8

13 F.3d 791, 799 (4th Cir.), *cert. denied*, 513 U.S. 813 (1994).  Defendants LaManna, Acosta, Steve Harrison, and Rosario are all in supervisory positions who provide oversight of  ancillary staff; however, none of them were involved in the personal decisions made in relation to the plaintiff's allegations.  See def. m.s.j., ex. 12, 17, 18, 19.  As will be shown below, the plaintiff has failed to show a constitutional injury inflicted by the subordinates of these defendants, and he has failed to establish issues of material fact with regard to the three elements necessary for supervisory liability.


### Prison Assignment

The plaintiff's claims fail on the merits.  Federal courts are required to accord great consideration to a correctional system's need to maintain order, discipline, and control.  *Wolff v. McDonnell*, 418 U.S. 539, 558-562 (1974).  There is no constitutional right for a state prisoner or federal prisoner to be housed in a particular institution, at a particular custody level, or in a particular portion or unit of a correctional institution.  *See Olim v. Wakinekona*, 461 U.S. 238, 244-48 (1983); and *Lyons v. Clark*, 694 F. Supp. 184, 186-87 (E.D. Va. 1988) (collecting cases).  The decision of where an inmate should be placed within the prison system is within the discretion of the BOP, and that decision should not be disturbed by the courts, absent an abuse of that discretion.  *Marchesani v. McCune*, 531 F.2d 459, 461-62 (10th Cir. 1976); *James v. Reno*, 39 F.Supp.2d 37, 42 (D.D.C. 1999). The plaintiff has not provided any evidence showing the defendants abused their discretion in this case.  Accordingly, the claim fails.


### Job Assignment

All inmate job assignments are subject to the institution's needs, and inmates do not have any fundamental constitutional right to any specific work assignment.  *Ingram v. Papalia*, 804 F.2d 595, 596-97 (10th Cir. 1986); *Altizer v. Paderick*, 569 F.2d 812, 813 (4th

9

Cir. 1978); *Delaney v. Ozmint*, Civil Action No. 4:05-1968-HFF-TER, 2006 WL 1878982, *8 (D.S.C. July 5, 2006) (slip copy).  However, the plaintiff alleges he was not immediately reinstated into his UNICOR work assignment after being released from administrative detention because of his race (black).  Specifically, he alleges the defendants hired a white inmate into his work assignment just so they would not have to reinstate him into the position.  He also alleges the defendants reinstated three white inmates, who were also placed in administrative detention, immediately after their release from administrative detention.

"Racial discrimination in prisoner job assignments states a violation of the equal protection clause of the Fourteenth Amendment and of the due process clause of the Fifth Amendment."  *Hollingsworth v. Wagoner*, No. 90-6783, 1990 WL 187125, *1 (4th Cir. 1990)(unpublished) (citing *Davis v. Passman*, 442 U.S. 228 (1979)).  "A prisoner seeking to establish a violation of the equal protection clause must prove that discriminatory purpose is a motivating factor in the decision made by the prison official, then the prison official must prove that the same decision would have resulted even had the impermissible purpose not been considered.  "*Id.* (citing *Knop v. Johnson*, 667 F.Supp. 467 (W.D. Mich 1987)).

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.  Among the factors that a court may look to are the specific sequence of events leading up to the challenged decision, specifically any departures from the normal procedural sequence or substantive departures.

*Id.* at *2 (quoting *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266-67 (1977)).

The evidence before the court shows that, subsequent to the plaintiff's placement in administrative detention, the factory filled his position with another inmate due

10

to customer demands experienced by the factory during that time (def. m.s.j., ex. 12, 13). There was no way to determine how long the plaintiff would be in administrative detention and his position needed to be filled. *Id.* The UNICOR regulations provide that when an inmate is absent for a significant period of time his position can be filled by another inmate, and the first inmate will have no entitlement to continued UNICOR employment. *See* 28 C.F.R. § 345.67(a). Thus, it was wholly within UNICOR's discretion to replace the plaintiff after his placement in administrative detention.

On May 14, 2006, the plaintiff was released from administrative detention, having been found not to have committed a prohibited act. The UNICOR regulations also provide that for up to the first 30 days an inmate is in administrative detention, that inmate may retain UNICOR pay grade status, with actual pay suspended, and will be able to return to UNICOR, provided the inmate was not found to have committed a prohibited act. *See* 28 C.F.R. § 345.67(a)(2). Prior to and after the plaintiff's placement in administrative detention, there had been a hiring freeze within the department where he was assigned. *See* def. m.s.j., ex.12, 13. Thus, even though the plaintiff was not found to have committed a prohibited act, and UNICOR regulations provide that he would be able to return to his work assignment, there was no position for him. However, the plaintiff was informed that as soon as the hiring freeze was lifted he would be placed back into his work assignment. On July 17, 2006, the hiring freeze was lifted, and the plaintiff was placed back into his work assignment. *Id.* As for the plaintiff's allegation regarding the reinstatement of three white inmates during the hiring freeze, defendants Steve Harrison and Spoon testified in their affidavits that the department where those inmates had been assigned did not have a hiring freeze in effect and that is why they were reinstated subsequent to their release from administrative detention. *Id.*

Based upon the foregoing, there is no evidence of discrimination on the behalf of the defendants regarding the plaintiff's work assignment. Accordingly, the claim fails.

11

***Dental Care***

   The plaintiff also alleges that the defendants were deliberately indifferent to his dental needs.  Deliberate indifference by prison personnel to an inmate's serious illness or injury is actionable under 42 U.S.C. § 1983 as constituting cruel and unusual punishment contravening the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976).  The government is "obligat[ed] to provide medical care for those whom it is punishing by incarceration."  *Id.* at 102.  This obligation arises from an inmate's complete dependence upon prison medical staff to provide essential medical services.  *Id.*  The duty to attend to prisoners' medical needs, however, does not presuppose "that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."  *Id.* at 105.  To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.  *See Rogers v. Evans*, 792 F.2d 1052, 1058 (5th Cir. 1986).  "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it."  *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999).

   In order to establish that he has been subjected to cruel and unusual punishment, the plaintiff must prove that the deprivation of a basic human need was, objectively, sufficiently serious, and that, subjectively, the officials acted with a sufficiently culpable state of mind. *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir.1993)(quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  What suffices as a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).  Courts have traditionally attempted to avoid intervening and dictating the medical care of prisoners. As noted by the Fourth Circuit, courts should "disavow any attempt to second-guess the

12

propriety or adequacy of a particular course of treatment. . . .[which] remains a question of sound professional judgment." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).

With respect to the subjective component of deliberate indifference, while an "express intent to inflict unnecessary pain is not required . . . [i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the cruel and unusual punishment clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Mere disagreement between an inmate and a physician over the appropriate form of treatment is not an actionable constitutional claim. *Wright v. Collins*, 766 F2d 841, 849 (4th Cir. 1975).

As argued by the defendants, the plaintiff's gums have been examined, no problems have been found that are consistent with his allegations, and he has presented no extraordinary medical or administrative circumstances that would justify a deviation from the accepted standards of care described above. While the plaintiff claims to be unable to eat because of problems with his teeth, the treatment notes from the BOP show that he has gained over 10 pounds (def. m.s.j., ex. 15). The plaintiff's allegations rise only to a level of mere disagreement over the treatment he received, which is not an actionable constitutional claim. *Id*. He has offered no proof that he has not been provided adequate dental treatment, nor has he shown deliberate indifference on the part of the defendants. Accordingly, the claim fails.

### *Qualified Immunity*

The defendants further claim that they are entitled to qualified immunity. This court agrees. Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This qualified immunity is lost if an official violates a

13

constitutional or statutory right of the plaintiff that was clearly established at the time of the alleged violation so that an objectively reasonable official in the defendants' position would have known of it. *Id.*

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Further, the Supreme Court held that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609. If the court first determines that no right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998).

To the extent the plaintiff has alleged any other state law claims against the defendants, the court should decline to exercise supplemental jurisdiction over any such claims as it is recommended that summary judgment be granted on the federal claims. *See* 28 U.S.C. § 1367(c).

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, this court recommends that the defendants' motion for summary judgment be granted.

March 23, 2007

Greenville, South Carolina

_____
WILLIAM M. CATOE
UNITED STATES MAGISTRATE JUDGE

14